OPINION
{¶ 1} Defendant-appellant, Randolph R. Ragland, appeals from his conviction of two counts of rape, violations of R.C. 2907.02, and his classification as a sexual predator. For the following reasons, we affirm.
 {¶ 2} On February 2, 2000, Ragland was indicted on two counts of rape. Ragland's co-defendant, his daughter Natasha Barnes, was indicted on one count of rape and one count of complicity to rape. These charges arose from the allegations of Barnes' best friend, who maintained that Ragland and Barnes raped her on or about August 30, 1999.
 {¶ 3} Ragland and Barnes waived their right to a trial by jury, and, thus, they were tried before a judge. Trial did not commence until March 4, 2004 — over four years after the indicted offenses occurred.
 {¶ 4} At trial, the victim testified that she and Barnes had been friends for about three years. The victim and Barnes had met in high school, and after both graduated in 1999, they decided to live together in a house next door to Barnes' father.
 {¶ 5} The victim testified that in late August 1999, Ragland tried to hug her and kiss her on the neck. Although he did not persist when the victim pushed him away and said "no," the victim felt uncomfortable around him.
 {¶ 6} The evening of August 30, 1999, the victim, Barnes, and the victim's younger brother visited Ragland at his place of employment, the Waste Water Treatment Plant at Jackson Pike. The victim and Barnes then went to Ragland's house, where Barnes resided, so that they could pack Barnes' possessions for their move. While the girls were packing, Ragland gave them some marijuana, which Barnes made into a blunt that the girls smoked.
 {¶ 7} The victim, Barnes, and Ragland then went outside, and the victim and Barnes started drinking shots of vodka. The victim estimated that she downed approximately seven shots in quick succession. She started feeling intoxicated, so she went inside and laid down on the living room couch. Barnes joined her in the living room.
 {¶ 8} The victim testified that she fell asleep on the couch, but awoke to Ragland rubbing her arm and trying to kiss her. The victim told Ragland to stop and then followed Barnes into Ragland's bedroom. Both girls fell asleep again on Ragland's bed.
 {¶ 9} The victim next awoke when Ragland pushed her and Barnes off his bed. She blacked out on the floor, and when she came to, she was naked with both Barnes and Ragland on top of her. Barnes and Ragland were also naked.
 {¶ 10} The victim testified that Barnes was straddling her upper body, holding her arms to the floor with her knees. Ragland was on top of her lower body, performing oral sex on her. Ragland then engaged in vaginal intercourse with the victim, while Barnes restrained her arms. The victim also testified that Barnes performed oral sex on her.
 {¶ 11} Throughout the attack, the victim told Barnes and Ragland to stop and tried to get up. Neither Barnes nor Ragland responded to the victim's pleas, and they continued to hold her down. Eventually, the victim said that she was going to throw up, and the pair released her. The victim went into the bathroom, where she locked the door and cried. Barnes came to the bathroom door and asked the victim what was wrong, and then she retrieved a tampon for the victim after the victim asked for one.
 {¶ 12} After the victim left the bathroom, she had difficulty locating her clothes and dressed herself in the only clothes she could find — a shirt, panties, and shoes. When the victim could not find her car keys, she ran out of the house and down the street to the nearby Clark gas station. The victim banged on a side door until the gas station attendant unlocked it and let her enter. She told the gas station attendant that she had been raped, and he immediately called the police. In the meantime, Barnes came into the store. She repeatedly asked the victim what she was doing and to not tell the police. The victim responded that Barnes and Ragland had raped her and asked Barnes why they had done it. Barnes left the Clark station when the victim said she "was telling." Columbus police officers arrived soon thereafter and took the victim to the hospital.
 {¶ 13} Scott Prindle was the cashier on duty at the Clark gas station the night of August 30, 1999. He testified at trial that about 1:45 a.m., he saw two women running by his store. The woman in the lead, who appeared to be dressed only in her underwear, said she had been raped, so Prindle unlocked the side door and let the women enter. Prindle testified that the undressed woman looked shocked and was crying.
 {¶ 14} Once the women were in the gas station, the fully-clothed woman begged the other woman not to call the police. The other woman responded that, "he raped me and you helped." When Prindle picked up the telephone to call the police, the fully-clothed woman ran out of the gas station. Prindle later saw her drive a car onto the Clark lot, park, and leave again.
 {¶ 15} Janice Cunningham, the victim's mother, testified that she received a phone call the night of August 30, 1999 from her daughter. Cunningham stated that her daughter was crying and that she had never heard her daughter as upset as she was that night. Harold Connley, a then Columbus patrol officer who responded to Prindle's call, also testified that the victim was very upset that night, to the point of being almost hysterical.
 {¶ 16} Barnes' testimony at trial varied significantly from the victim's testimony. Although Barnes also testified that she and the victim visited her father at the Waste Water Treatment Plant and then went to Barnes' home, she denied ever raping or helping to rape the victim. Rather, Barnes testified that after she and the victim first arrived at her home, they drank shots of vodka in Barnes' basement bedroom. They continued to drink on the front porch, and then went to the living room to watch television. Barnes maintained that the pair never smoked any marijuana that night.
 {¶ 17} Barnes fell asleep in the living room, and when she awoke, the victim was no longer there. Curious about the location of her friend, Barnes searched the house for her and found her and Ragland in Ragland's bedroom. Barnes testified that the victim was on top of Ragland, engaging in sexual intercourse with him.
 {¶ 18} Shocked by what she had seen, Barnes went to her downstairs bedroom and laid down on the couch. She fell asleep, but awoke again to find the victim bending over her and trying to kiss her. Barnes told the victim "no," and the victim went upstairs. The victim then came back downstairs and asked Barnes for a tampon. Barnes directed her to the downstairs bathroom, and the victim visited the bathroom and went back upstairs. Minutes later, Ragland came to the top of the stairs and told Barnes that the victim was walking down the street in just her underwear. Barnes grabbed the victim's car keys from her dresser and drove the victim's car to the Clark gas station because Ragland told her that the victim had headed that way.
 {¶ 19} At the gas station, Barnes found the victim and asked her what was the matter. Barnes testified that the victim started crying and told Barnes to leave her alone. Although Barnes kept trying to get the victim to tell her what was the problem, the victim did not respond, so Barnes returned home.
 {¶ 20} Like his daughter, Ragland denied ever raping the victim. To the contrary, Ragland testified that he and the victim were engaged in a new sexual relationship that the victim had initiated. Ragland also testified that the victim discouraged him from working the night of August 30, 1999 so that they could spend time together.
 {¶ 21} That night, Ragland arrived at his house before the girls, and he took a bath. When he finished, he found Barnes and the victim outside, drinking and acting silly. Ragland told the victim to come to bed and retreated to his bedroom. The victim eventually followed Ragland into the bedroom, where they had consensual sexual intercourse.
 {¶ 22} Although Ragland admitted to tasting alcohol in the victim's mouth during this encounter, he denied smelling any marijuana on the victim. Ragland also denied giving the victim any marijuana.
 {¶ 23} Ragland testified that the victim tried to instigate further sexual intercourse, but he was no longer capable. Frustrated, the victim dressed in her shirt and panties and left his bedroom.
 {¶ 24} A short time later, Ragland heard a noise and rose to investigate. He found the victim climbing the stairs from the basement with a "far-away" look in her eyes. Ragland asked the victim what she was doing, and the victim told him that she was going outside to get some air. Ragland said that she could not go because she did not have pants on, but the victim responded that she was just going to the carport. When the victim started walking out to the carport, Ragland again asked her what she was doing and what was wrong. The victim did not respond and started walking toward the gas station.
 {¶ 25} Ragland yelled for his daughter, who followed the victim to the gas station in the victim's car. After about ten minutes, Barnes returned and told Ragland that the victim was at the gas station, crying. Ragland asked Barnes what was wrong with the victim, and Barnes said that she did not know. Ragland then went back to bed.
 {¶ 26} After the close of evidence, the trial court found Ragland guilty of both counts of rape and Barnes guilty of complicity to rape. At a sexual predator hearing, the trial court considered the facts adduced at trial and the information in Ragland's pre-sentencing investigation report ("PSI report"), and classified him as a sexual predator. The trial court then sentenced Ragland to eight years of imprisonment on each count of rape and ordered that Ragland serve these terms consecutively.
 {¶ 27} On July 16, 2004, the trial court issued a judgment entry reflecting Ragland's convictions, his sexual predator classification, and his sentence. Ragland now appeals from that judgment.
 {¶ 28} On appeal, Ragland assigns the following errors:
[1.] There was insufficient evidence to support Appellant's conviction and the conviction was against the manifest weight of the evidence.
[2.] The trial court committed reversible error when it labeled Appellant a sexual predator when there was insufficient evidence to prove by a [sic] clear and convincing evidence that Appellant met the criteria for said label.
[3.] The trial court committed reversible error when it permitted hearsay evidence from the alleged victim's mother as to what the alleged victim told her father over the phone, when said statement clearly was intended to prove the truth of the matter asserted.
 {¶ 29} By his first assignment of error, Ragland challenges both the sufficiency of the evidence supporting his conviction and the manifest weight of that evidence. The legal concepts of sufficiency of the evidence and weight of the evidence are quantitatively and qualitatively different. State v. Thompkins (1997), 78 Ohio St.3d 380, paragraph two of the syllabus. Therefore, we will discuss Ragland's sufficiency of the evidence and manifest weight arguments separately.
 {¶ 30} First, with respect to sufficiency of the evidence, the operative inquiry is whether the evidence is adequate to sustain a verdict. Id., at 386-387. When reviewing the sufficiency of the evidence, an appellate court must:
[E]xamine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. * * *
State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus. This test raises a question of law and does not allow the court to weigh the evidence. Thompkins, at 386; State v. Thomas (1982),70 Ohio St.2d 79, 79-80. Rather, the sufficiency of the evidence test "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." Jackson v.Virginia (1979), 443 U.S. 307, 319. Consequently, when reviewing the sufficiency of the evidence, an appellate court must accept the determination of the finder of fact with regard to the credibility of the witnesses. State v. Yarbrough, 95 Ohio St.3d 227, 2002-Ohio-2126, at ¶79; State v. Worrell, Franklin App. No. 04AP-410, 2005-Ohio-1521, at ¶ 41 ("In determining whether a conviction is based on sufficient evidence, we do not assess whether the evidence is to be believed, but, whether, if believed, the evidence against a defendant would support a conviction.").
 {¶ 31} A trier of fact must convict a defendant of rape if the state proves beyond a reasonable doubt that the defendant engaged in sexual conduct with another when the defendant purposely compels the other person to submit by force or threat of force. R.C. 2907.02(B). Here, the victim's testimony, viewed in the state's favor, establishes the elements of each rape offense beyond a reasonable doubt. The victim testified that Ragland held her down and forced both vaginal and oral intercourse on her, despite her pleas to stop and let her go. Accordingly, we conclude that sufficient evidence supported Ragland's conviction.
 {¶ 32} In arguing otherwise, Ragland does not maintain that the state failed to prove any element of rape. Rather, Ragland attacks the victim's credibility, arguing that her testimony cannot be believed because: (1) she admitted that she blacked out the night of August 30, 1999, (2) she allowed that she might do things while intoxicated that she may not do sober, and (3) her testimony contained inconsistencies. However, as we stated above, an appellate court cannot evaluate a witness' credibility on a review for evidentiary sufficiency but, instead, must adopt the trier of fact's credibility determination. Yarborough, supra, at ¶ 79. Therefore, Ragland's attack on the victim's credibility does not alter our conclusion that the evidence is sufficient for conviction.
 {¶ 33} In challenging the sufficiency of the evidence, Ragland also argues that this court cannot rely upon the testimony of Prindle, the Clark gas station attendant. Although Prindle's testimony supports the victim's version of the events, it is irrelevant to our review of the sufficiency of the evidence. As we stated above, the victim's testimony alone, when viewed in the light most favorable to the state, adequately establishes each element of the rape offenses.
 {¶ 34} By his first assignment of error, Ragland also argues that his conviction is against the manifest weight of the evidence. When presented with a challenge to the manifest weight of the evidence, an appellate court, after "`reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'"Thompkins, supra, at 387, quoting State v. Martin (1983),20 Ohio App.3d 172, 175. An appellate court should reserve reversal of a conviction as being against the manifest weight of the evidence for only the most "`exceptional cases in which the evidence weighs heavily against conviction.'" Id.
 {¶ 35} A defendant is not entitled to a reversal on manifest weight grounds merely because inconsistent evidence was presented at trial.State v. Raver, Franklin App. No. 02AP-604, 2003-Ohio-958, at ¶ 21. The trier of fact is in the best position to take into account inconsistencies, along with the witnesses' manner and demeanor, and determine whether the witnesses' testimony is credible. State v.Williams, Franklin App. No. 02AP-35, 2002-Ohio-4503, at ¶ 58. Consequently, although an appellate court must act as a "thirteenth juror" when considering whether the manifest weight of the evidence requires reversal, it must also give great deference to the fact finder's determination of the witnesses' credibility. State v. Covington, Franklin App. No. 02AP-245, 2002-Ohio-7037, at ¶ 28.
 {¶ 36} Like his sufficiency of the evidence argument, Ragland's manifest weight argument centers upon the victim's credibility. However, our review of the victim's testimony does not reveal any major inconsistencies that would lead us to doubt her believability. Indisputably, during her testimony, the victim could not remember certain details and she sometimes contradicted statements she had given earlier. However, considering that more than four years had elapsed between August 30, 1999 and the beginning of the trial, a certain amount of memory loss and inconsistency is normal and does not adversely impact a witness' credibility. State v. Brown, Franklin App. No. 03AP-331, 2004-Ohio-1219, at ¶ 25.
 {¶ 37} Further, the victim's testimony is buttressed by the testimony of Prindle, the only disinterested witness to the major events of August 30, 1999. Prindle testified that he heard the victim say, "he raped me and you helped" as Barnes begged the victim not to call the police. This testimony, along with his recounting of the actions of the victim and Barnes while they were in the Clark gas station, dovetails with the victim's testimony and, thus, supports her version of the events. Accordingly, we conclude that Ragland's conviction is not against the manifest weight of the evidence.
 {¶ 38} Ragland, however, maintains that the trial judge lost her way in finding him guilty because she was improperly swayed by the victim's crying during her testimony and misconstrued Ragland's sweaty, red face as he testified. We disagree. Not only is a trier of fact permitted to consider a witness' demeanor in determining credibility, but the trier of fact is uniquely situated to do so, and we will not second guess those determinations. State v. Berry, 159 Ohio App.3d 476, 2004-Ohio-6027, at ¶ 10.
 {¶ 39} Moreover, we are not persuaded by Ragland's argument that the victim's testimony is incredible because he allegedly would not perform oral sex on a menstruating woman. Ragland's alleged distaste is an insufficient basis to render the victim's testimony unworthy of belief.
 {¶ 40} Finally, we also reject Ragland's attack on the veracity and reliability of Prindle's testimony. First, Ragland asserts that Prindle's testimony lacks credibility because the report of the detective who interviewed Prindle does not contain the statements Prindle testified he heard the victim and Barnes make in the gas station. However, Prindle testified that he repeated those statements to the detective. Additionally, Prindle did not review the detective's report until immediately before his testimony and, thus, he had no opportunity to correct any inaccuracies or omissions in the report except through his testimony.
 {¶ 41} Second, Ragland asserts Prindle's testimony that the victim stated, "he raped me and you helped" is unreliable because the victim did not mean what she said. Ragland bases this assertion on the victim's alleged testimony at trial that she could not remember anything that occurred in the gas station. Ragland reasons that this memory lapse means that the victim was not conscious of the meaning of her statements when she made them. Not only is this reasoning nonsensical, but it also misconstrues the victim's testimony. Although the victim remembered and testified to much of what occurred in the gas station, she testified that she could not remember exactly what she said to the police officers who interviewed her at the gas station. This lapse in her memory does not make her statement that "he raped me and you helped" untrue or discredit Prindle's memory of this statement. Therefore, we find Prindle's testimony both credible and reliable.
 {¶ 42} After viewing the entirety of the record, we are not convinced that this is the exceptional case in which the manifest weight of the evidence requires reversal. Accordingly, we overrule Ragland's first assignment of error.
 {¶ 43} By his second assignment of error, Ragland argues that the trial court erred in classifying him a sexual predator. Ragland does not dispute that he committed a sexually oriented offense but, instead, argues that the state failed to prove by clear and convincing evidence that he is likely to commit other sexually oriented offenses in the future. We disagree.
 {¶ 44} In order for a defendant to be classified a sexual predator, the state must prove by clear and convincing evidence that the defendant was convicted of, or pled guilty to, committing a sexual oriented offense and that the defendant is likely to engage in the future in one or more sexually oriented offenses. Former R.C. 2950.01(E)(1); State v. Eppinger
(2001), 91 Ohio St.3d 158, 161. Clear and convincing evidence is that quantity and quality of evidence that "will provide in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." Cincinnati Bar Assn. v. Massengale (1991), 58 Ohio St.3d 121,122. While meeting the clear and convincing burden requires a degree of proof more than a mere "preponderance of the evidence," it does not require proof "beyond a reasonable doubt" as in criminal cases. Cross v.Ledford (1954), 161 Ohio St. 469, paragraph three of the syllabus.
 {¶ 45} In applying this burden of proof, a court should consider and discuss on the record all relevant factors it uses to determine whether the proffered evidence is sufficient to support a finding that the offender is likely to engage in future sex offenses. Eppinger, supra, at 166. These factors include: (a) the offender's age; (b) the offender's prior criminal record regarding all offenses, including sex offenses; (c) the age of the victim; (d) whether the sex offense involved multiple victims; (e) whether the offender used drugs or alcohol to impair the victim or prevent the victim from resisting; (f) if the offender committed a previous offense, whether the offender completed any sentence imposed and, if the previous offense was a sex offense, whether the offender participated in any available programs for sexual offenders; (g) any mental illness or mental disability of the offender; (h) the nature of the offender's sexual conduct, contact or interaction with the victim and whether the offender engaged in a pattern of abuse with the victim; (i) whether the offender displayed cruelty or made one or more threats of cruelty; and (h) any additional behavior characteristics that contributed to the offender's conduct. Former R.C. 2950.09(B)(3).
 {¶ 46} No requisite number of these factors must apply before a court finds an offender to be a sexual predator, and the trial court may place as much or as little weight on any of the factors as it deems to be appropriate. State v. Walker, Franklin App. No. 04AP-1107, 2005-Ohio-3540, at ¶ 10; State v. Fears, Franklin App. No. 04AP-1164, 2005-Ohio-2960, at ¶ 6. Because the test is not a balancing one, even one or two of the factors are sufficient as long as the evidence of likely recidivism is clear and convincing. Worrell, supra, at ¶ 82; State v. McDonald,
Franklin App. No. 03AP-853, 2004-Ohio-2571, at ¶ 8.
 {¶ 47} In the case at bar, the trial court based its conclusion that Ragland was a sexual predator on at least five different factors. First, the trial court found that Ragland had a criminal record, which included one conviction for a sex offense. According to Ragland's PSI report, he pled guilty to one count of gross sexual imposition in 1980, he was sentenced to 60 months imprisonment, and he was released on parol in November 1983. Second, the trial court found that Ragland did not avail himself of any programs for sex offenders. Third, the trial court found that the age difference between the victim and Ragland was relevant. At the time of the offenses, the victim was 18 years old and Ragland 40 or 41. Fourth, the trial court found that drugs and alcohol were involved in the commission of the offenses. Fifth, the trial court found that the nature of the offenses "unbelievable and repulsive" given that Ragland used his daughter to help him rape his daughter's best friend.
 {¶ 48} Ragland challenges almost all of the trial court's findings. First, Ragland argues that the trial court should not have viewed his failure to attend a sexual offender program as a factor for finding him a sexual predator. Ragland asserts that an offender who is not counseled should not be labeled a sexual predator until it is determined whether counseling would be helpful. This argument is unavailing. Ragland's failure to obtain counseling or attend a sexual offender program demonstrates his unwillingness to admit or address his capacity to commit sex offenses. Such a failure makes it more, not less, likely that he will commit another sex offense in the future.
 {¶ 49} Second, Ragland argues that the trial court erroneously relied on unsubstantiated allegations that he abused his daughter in concluding that he was a sexual predator. However, our review of the record shows that in response to defense counsel's objection, the trial court decided not to consider those allegations and did not later rely upon them when adjudicating Ragland a sexual offender.
 {¶ 50} Third, Ragland argues that the trial court misapplied the factor involving drugs or alcohol. Ragland asserts that the trial court found that the evidence was equivocal regarding whether he supplied the victim with drugs. Nevertheless, the trial court relied upon the involvement of drugs and alcohol in the commission of the offenses to classify Ragland a sexual predator.
 {¶ 51} Although Ragland may not have used drugs and alcohol to impair the victim, Ragland admitted that he knew the victim had been drinking alcohol, and he used her intoxicated state to facilitate his offenses. Therefore, we conclude that the court could properly rely upon Ragland's willingness to exploit the effects of intoxicants as an additional behavior characteristic that contributed to his conduct.
 {¶ 52} Fourth, Ragland argues that the trial court erred in finding the nature of his offenses sufficiently "deviant, depraved, or cruel" to justify the sexual predator classification. We disagree. As the trial court found, working together with one's daughter to effectuate the rape of the daughter's best friend goes way beyond moral and societal restrictions. The victim testified that Ragland used his daughter to hold the victim's upper body down as he raped her both vaginally and orally. By engaging in such bizarre, outrageous sexual conduct, Ragland showed a lack of restraint that is indicative of a likelihood that Ragland will commit future sex offenses. See State v. Griffin (2000),140 Ohio App.3d 433, 441 ("The legislature clearly believed that sexual conduct of a violent and bizarre nature on the part of the offender * * * and other aberrant behavioral characteristics correlated with an increased likelihood that an offender will engage in the future in one or more sexually related offenses.").
 {¶ 53} Fifth, Ragland argues that the trial court erred in stating that Ragland's daughter was a second victim of his offenses. Ragland is correct that no evidence exists regarding whether Ragland pressured or manipulated Barnes into helping him, and without such evidence, it is hard to gage whether Barnes was a voluntary participant or a coerced "victim." However, even if the trial court erred in making the finding that Barnes was a victim, the error is harmless because the trial court did not rely upon the multiple victims factor in classifying Ragland a sexual predator.
 {¶ 54} Finally, Ragland argues that the age difference between him and the victim has no bearing upon whether he is likely to re-offend. We agree. Although Ragland's significant age advantage may have given him more power and experience, the victim was an adult at the time of the offenses. Further, this is not a situation in which the defendant used his age advantage to commit his crimes or manipulate his victim.
 {¶ 55} However, given the factors and evidence discussed above, even if the age difference is not considered, we conclude that sufficient evidence exists to establish by clear and convincing evidence that Ragland is likely to commit future sex offenses. As the trial court found, Ragland's prior criminal history, his failure to complete any sexual offender programs, the involvement of drugs and alcohol in his offenses, and the nature of his offenses all indicate that he likely to re-offend. Accordingly, we overrule Ragland's second assignment of error.
 {¶ 56} By his third assignment of error, Ragland argues that the trial court improperly admitted hearsay evidence of Janice Cunningham's husband's statements. We disagree.
 {¶ 57} During her testimony, Cunningham, the victim's mother, testified that when her husband answered the telephone the night of August 30, 1999, he turned to her and told her that the victim was on the telephone and that she said she had been raped. Ragland asserts that this testimony is hearsay, and its admission constitutes reversible error. However, we conclude that no error occurred because the trial court struck the objectionable testimony at the end of Cunningham's testimony. (Tr. 275.) ("[T]he court will strike from the record any testimony from Mrs. Cunningham that [the victim] told her father that she had been raped.").
 {¶ 58} Accordingly, we overrule Ragland's third assignment of error.
 {¶ 59} For the foregoing reasons, we overrule Ragland's first, second, and third assignments of error and affirm the judgment of the Franklin County Court of Common Pleas.
Judgment affirmed.
French and McGrath, JJ., concur.