[Cite as *State v. Anderson*, 2015-Ohio-4458.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio,                              :

      Plaintiff-Appellee,                 :

                                          No. 14AP-1047
v.                                          :            (C.P.C. No. 13CR-5679)

Martaye D. Anderson,                        :            (ACCELERATED CALENDAR)

      Defendant-Appellant.                :

---

D E C I S I O N

Rendered on October 27, 2015

---

*Ron O'Brien*, Prosecuting Attorney, and *Sheryl L. Prichard*, for appellee.

*Richard B. Parry* and *John W. Vogel, Jr.*, for appellant.

---

APPEAL from the Franklin County Court of Common Pleas

KLATT, J.

{¶ 1} Defendant-appellant, Martaye D. Anderson, appeals from a judgment of conviction entered by the Franklin County Court of Common Pleas. For the following reasons, we affirm that judgment.

## I. Factual and Procedural Background

{¶ 2} In the early morning hours of September 12, 2013, Columbus Police Detective, Eric Poliseno, interviewed a rape victim, K.W. K.W. told the detective that she had been at a friend's house and left with appellant to walk home. As they were walking, Donald Terry joined and walked with them. Terry grabbed her and initially attempted to drag her into an apartment, but after K.W. struggled, he dragged her into a dark, open garage across the alley. The garage did not have a garage door but did have a "door, like a

normal-size door, like a house door, similar to that, in the back of the garage."  (Tr. 115.) Terry pinned her against a parked car in the garage and held her hands behind her back while he vaginally and anally raped her.  When he finished, Terry ran away.

{¶ 3}  Appellant was present the entire time and K.W. could see him most of the time.  Initially, appellant closed the door in the back of the garage.  Appellant walked in and out of the garage through the front doorway because the back door remained closed. K.W. stated, at one point, appellant was behind her and she could not see him.

{¶ 4}  Afterwards, appellant walked her home.  K.W. repeatedly asked appellant if he had participated in the rape, because at one point, she felt a metal belt buckle on her backside and he was wearing a large belt buckle.  After she was home, K.W.'s mother took her to the hospital where a nurse collected a rape kit and the police interviewed her.  K.W. initially told Detective Poliseno that she was unsure whether appellant had participated in the rape, but she did not think he did so because she did not see him rape her.  However, she stated that, at one point "it felt like he [Terry] had help, like, because it just felt like he had more hands than he was supposed to. * * * So it seemed like the other dude was helping."  (Tr. 24-25.)  This was the same time period that appellant was behind her and out of view.  (Tr. 249.)  K.W. testified that she felt as if appellant had participated in the incident because there were too many hands involved for one person, she felt a belt buckle and she knew appellant was wearing a belt buckle.  When asked about whether she believed appellant participated in the rape, K.W. testified as follows:

> There was a slight difference in the penis inside of me.  There was a slight difference.  And it felt like when one -- or something came out, I felt, and it went back in, but it didn't feel the same.
>
> There was a brief moment, like brief, where there was just nothing, like there was -- and I couldn't see, but I could hear, like, but no one was talking, like exchanging the positions, not me, but people, them, the guys.  But I don't know for sure.  I'm just going off of what I can hear because I can't see because I'm head down.

(Tr. 132.)

{¶ 5}  When K.W. was asked about her statement regarding too many hands, she clarified her statement, as follows:

So at one point, it just felt like when somebody was raping me, I don't know who, but it seemed like another person had my hands, like, it just felt like a switch. That's all I can explain. It felt like a switch. It felt like there's too many hands.

* * *

That's where the belt buckle comes in. When I say a switch, it felt like if Ray was raping me when he was, there was a stop for a brief moment. There was a stop, and I just felt like -- well, so as far as a struggle, like, it got easier for whoever had my hands. It got easier to hold them, like they didn't have to struggle with me.

And then, like I said, there was a belt buckle. I don't know for sure whose belt buckle it was. I didn't notice if Ray had a belt; I know Martaye had a belt. I felt a belt, and this is the first time I felt the belt. That's why I brought it up. The belt had, like, touched my butt, like somebody else was undoing something. That's all, like the belt.

* * *

When I say it's a switch, I can't see, but based off what I felt, when initially someone had my hands, my hands were pinned the whole time. At first, I was able to -- I could push back and then I could -- it was more room for me to like -- like it was less strength.

* * *

Yeah, like less strength on my hands. So then if, like, it got tight[.]

* * *

It got tighter, because he didn't have to focus on anything else, like me struggling. He didn't have to focus on two things at once. This is me describing it. So it got tighter. That's about it.

(Tr. 250-254.)

{¶ 6} Detective Poliseno interviewed appellant on October 8, 2013. Appellant admitted he was present during the rape, but denied participating. Appellant stated that Terry had a gun. Detective Poliseno testified that the Bureau of Criminal Investigations

("BCI") found a mixture of DNA on the vaginal swabs of K.W. from her sexual assault exam and the standards belonged to both appellant and Terry.  As a result, both appellant and Terry were arrested.  When Detective Poliseno interviewed appellant a second time, appellant continued to deny participating in the rape and told the detective that he and K.W. had consensual sex the night before the incident.  Detective Poliseno testified that he specifically asked K.W. if she had had consensual sex with appellant within 96 hours of the incident and she replied that she had never had consensual sex with appellant.  (Tr. 519-20.)  During her testimony, K.W. denied having consensual sex with appellant.  (Tr. 192.)  She testified that she had a baby on August 7, 2013, approximately five weeks before the incident, and for medical reasons, she was advised not to have sex for six weeks.  (Tr. 96; 128.)

{¶ 7}  The state presented two forensic scientists who work for BCI and testified regarding appellant's DNA.  One of the forensic scientists testified she examined the vaginal swabs taken from K.W. and identified semen.  The second forensic scientist analyzed the DNA results and determined that there was the presence of DNA from two individuals, consistent with Terry and appellant.  (Tr. 304.)  The DNA mixture was composed of a major profile, Terry, and a minor profile, appellant, which means the major profile was present at a much higher level than the minor profile.  (Tr. 306.)  Both scientists testified that there were several explanations for finding major and minor contributors, including that the minor contributor had consensual sex at an earlier time than the major contributor.  (Tr. 314; 620.)

{¶ 8}  Appellant also presented an expert witness who testified that there were three possibilities as to why there were vastly different amounts of sperm from the major and minor contributors.  The expert's opinion was that the DNA results in this case support several possibilities, including the possibility that appellant and K.W. had consensual sex within 96 hours of the assault.  (Tr. 696.)  However, on cross-examination, he stated that it was unlikely to have been within 24 hours of the assault.  (Tr. 699.)

{¶ 9}  Appellant presented two witnesses who testified appellant was living with his aunt at the time.  Both witnesses testified they had seen K.W. inside his aunt's house.  Appellant's cousin testified that in August 2013, he saw appellant and K.W. in the basement and K.W. was pulling up her pants.  Appellant's aunt testified that she saw

appellant, Terry, and K.W. sitting at her kitchen table one evening during the summer of 2013.

{¶ 10} On October 25, 2013, a Franklin County Grand Jury indicted both Terry and appellant on two counts of rape, a felony of the first degree, in violation of R.C. 2907.02. (Case No. 13CR-5679.) On December 13, 2013, the grand jury indicted Terry and appellant on one count of kidnapping, a felony of the first degree, in violation of R.C. 2907.01, with a sexual motivation specification under R.C. 2941.147. (Case No. 13CR-6529.) All the charges arise out of the September 12, 2013 incident. The two defendants had separate trials.[1] For trial purposes, the trial court consolidated appellant's two cases (the two indictments). A jury found appellant not guilty of rape, but guilty of complicity to rape, a violation of R.C. 2907.02, and also guilty of kidnapping, a violation of R.C. 2905.01.

{¶ 11} The trial court sentenced appellant on December 12, 2014. For purposes of sentencing, the trial court merged the complicity to rape and the kidnapping and imposed eight years as to the complicity to rape (Case No. 13CR-5679) at the Ohio Department of Rehabilitation and Corrections.

## II. The Appeal

{¶ 12} Appellant filed a timely notice of appeal and assigned the following error:

> THE CONVICTION IS NOT SUPPORTED BY SUFFICIENT EVIDENCE OR MANIFEST WEIGHT OF THE EVIDENCE.

## III. Legal Analysis

{¶ 13} In his assignment of error, appellant contends that the evidence is not sufficient to support his conviction for complicity to rape and it is against the manifest weight of the evidence.[2] We disagree.

{¶ 14} Sufficiency of the evidence is the "legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law." *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997), superseded by statute on other grounds. The question of whether the

---

[1] Terry was convicted of rape and kidnapping, and this court recently affirmed the judgments. *See State v. Terry*, 10th Dist. No. 15AP-176, 2015-Ohio-3847.

[2] Appellant only filed a notice of appeal in Case No. 13CR-5679, which is the complicity to rape conviction.

evidence is legally sufficient to support a verdict is a test of adequacy and a question of law.  *Id.*  " 'The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' "  *State v. Robinson*, 124 Ohio St.3d 76, 2009-Ohio-5937, ¶ 34, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus, superseded by statute on other grounds, following *Jackson v. Virginia*, 443 U.S. 307 (1979).  An appellate court will not disturb a verdict unless, after viewing the evidence in a light most favorable to the prosecution, it is clear that reasonable minds could not reach the conclusion reached by the trier of fact.  *State v. Treesh*, 90 Ohio St.3d 460, 484 (2001).

{¶ 15} During this inquiry, appellate courts do not engage in an evaluation of the witnesses' credibility but, rather, examine all the evidence admitted at trial to determine whether, if believed, that evidence supports the conviction.  *State v. Taylor*, 10th Dist. No. 14AP-857, 2015-Ohio-3252, ¶ 9, citing *State v. Yarbourgh*, 95 Ohio St.3d 227, 2002-Ohio-2126, ¶ 79-80; *State v. Bankston*, 10th Dist. No. 08AP-668, 2009-Ohio-754, ¶ 4.

{¶ 16} The test for determining whether a conviction is against the manifest weight of the evidence differs from the test as to whether there is sufficient evidence to support the conviction.  "Weight of the evidence concerns 'the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other.' "  *Thompkins* at 387, quoting Black's Law Dictionary 1594 (6th Ed.1990) (emphasis omitted).  Even though an appellate court finds sufficient evidence to support a judgment, the court may conclude that a judgment is against the manifest weight of the evidence.  *Taylor* at ¶ 10, citing *Thompkins* at 387.  An appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses and determine whether, in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.  *Id.*

{¶ 17} Within a manifest weight of the judgment review, an appellate court considers the credibility of the witnesses.  Courts should only reverse based upon manifest weight grounds in "the exceptional case in which the evidence weighs heavily against the conviction."  *Id.*, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).

"Moreover, ' "it is inappropriate for a reviewing court to interfere with factual findings of the trier of fact * * * unless the reviewing court finds that a reasonable juror could not find the testimony of the witness to be credible." ' " *State v. Redman*, 10th Dist. No. 10AP-654, 2011-Ohio-1894, ¶ 7, citing *State v. Brown*, 10th Dist. No. 02AP-11, 2002-Ohio-5345, ¶ 10, quoting *State v. Long*, 10th Dist. No. 96APA04-511 (Feb. 6, 1997). Therefore, we provide great deference to the jury's determinations of witness credibility. *Redman* at ¶ 26, citing *State v. Jennings*, 10th Dist. No. 09AP-70, 2009-Ohio-6840, ¶ 55; *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus (credibility determinations are primarily for the trier of fact). The appellate court's "ability to weigh the evidence and consider the credibility of witnesses is limited, since we must be mindful that the trier of fact was in the best position to evaluate the demeanor and credibility of witnesses and determine the weight to be accorded to the evidence." *State v. Galloway*, 10th Dist. No. 03AP-407, 2004-Ohio-557, citing *DeHass*, at paragraph one of the syllabus. The trier of fact is free to believe all, part, or none of the testimony of each witness appearing before it. *State v. Lindsey*, 10th Dist. No. 14AP-751, 2015-Ohio-2169, ¶ 44, citing *State v. Raver*, 10th Dist. No. 02AP-604, 2003-Ohio-958, ¶ 21.

{¶ 18} Appellant was convicted of complicity to rape. Under the principle of complicity, an individual may be found guilty if he "supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and * * * shared the criminal intent of the principal." *State v. Johnson*, 93 Ohio St.3d 240, syllabus. The intent necessary for a complicity conviction "may be inferred from the circumstances surrounding the crime." *Id.* Further, "[a] charge of complicity may be stated in terms of this section, or in terms of the principal offense." R.C. 2923.03(F). " 'Thus, a defendant charged with an offense may be convicted of that offense upon proof that he was complicit in its commission, even though the indictment is "stated * * * in terms of the principal offense" and does not mention complicity.' " *State v. Horton*, 10th Dist. No. 13AP-855, 2014-Ohio-2785, ¶ 8, quoting *State v. Herring*, 94 Ohio St.3d 246, 251 (2002).

{¶ 19} In order to convict appellant of complicity to rape, the state was required to prove beyond a reasonable doubt that he was "acting with the kind of culpability required for the commission of an offense [rape], * * * [a]id[ed] or abet[ted] another [Terry] in

committing the offense." R.C. 2923.03. The elements of rape require that the state prove under the facts of this case that appellant aided or abetted Terry while Terry "engage[d] in sexual conduct with another [K.W.] when the offender [Terry] purposely compels the other person to submit by force or threat of force." R.C. 2907.02(A)(2).

{¶ 20} Appellant does not contest that Terry raped K.W. and that appellant was present during the offense. However, he argues that the state failed to prove that he aided or abetted Terry in committing the rape because K.W.'s testimony regarding his involvement is not credible. However, as we previously stated, an appellate court cannot evaluate a witness's credibility on a review of the sufficiency of the evidence. Instead, we examine all the evidence admitted at trial to determine whether, if believed, that evidence supports the conviction. *Taylor*; *Yarbourgh*.

{¶ 21} Here, K.W.'s testimony, viewed in the state's favor, establishes the elements of a rape offense beyond a reasonable doubt. K.W. testified that Terry held her down and forced both vaginal and anal intercourse upon her. The evidence is also sufficient to support appellant's conviction for complicity to rape. K.W. testified that appellant closed the garage door after Terry dragged her into the garage and he was present during the rape. In recounting the events, she testified that at a point when she could not see appellant because he was behind her, she felt as if the men had switched positions. She felt as if there were too many hands involved to be only Terry because there was a tighter grip on her hands, she felt a belt buckle for the first time, and appellant was wearing a large belt buckle. After viewing this evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of complicity to rape proven beyond a reasonable doubt.

{¶ 22} Appellant also argues his conviction is against the manifest weight of the evidence because he contends that K.W.'s testimony regarding his involvement is not credible. Appellant cites several examples that he contends cast doubt on K.W.'s credibility.

{¶ 23} The first example appellant cites is the conflicting testimony from his expert and K.W. regarding the DNA evidence. Appellant's expert testified that, in his opinion, the DNA results in this case support several possibilities, including the possibility that appellant and K.W. had consensual sex within 96 hours of the assault. However, K.W.

testified she did not have consensual sex with appellant. All three experts testified that the DNA results indicating appellant was a minor contributor had several possible explanations, with consensual sex only one possible explanation. The jury was free to believe any of the possibilities.

{¶ 24} The second example involves K.W. testifying that she went to visit her girlfriend that evening, but later stated that she actually went to see appellant. However, appellant mischaracterized K.W.'s testimony. In the first interview, K.W. states she was "walking from my bestie's house" (Tr. 16) and when asked whether appellant was at her friend's house, she replied, "Yeah. That's who I was really going there to see." (Tr. 17.) K.W. testified at trial she went to her friend's house and appellant was there too. (Tr. 104.) She did not testify that it was her intention to visit her friend.

{¶ 25} Appellant's third example is that K.W. testified she and appellant were "just friends," but she testified they discussed "likes, dislikes in beds, stuff like the sexual positions, stuff of that nature." (Tr. 104; 107.) We cannot presume that a sexual discussion between the parties is an indication that the parties were having a sexual relationship.

{¶ 26} Finally, appellant cites K.W.'s identification of appellant as a participant as another example of K.W.'s testimony not being credible. K.W. did testify that the garage was dark and she was not wearing her glasses as appellant contends, but she did testify she could see appellant almost the entire time. Appellant finally contends that K.W.'s testimony is not credible because she testified she did not know if appellant participated in the crime since she did not see him participate, and her testimony regarding too many hands was accompanied by her testimony that she was unsure whether appellant participated in the crime.

{¶ 27} Cross-examination may have pointed out some inadequacies in the testimony, but we cannot say any inconsistencies so undermined the state's evidence as to render K.W.'s testimony not worthy of belief or the trial court's verdict against the manifest weight of the evidence. Our review of the record does not reveal any major inconsistencies that would render her testimony not worthy of belief. A conviction is not against the manifest weight of the evidence solely because the trier of fact heard conflicting testimony. *State v. Raver*, 10th Dist. No. 02AP-604, 2003-Ohio-958, ¶ 21.

"The trier of fact is in the best position to take into account inconsistencies, along with the witnesses' manner and demeanor, and determine whether the witnesses' testimony is credible." *State v. Ragland*, 10th Dist. No. 04AP-829, 2005-Ohio-4639, ¶ 35, citing *State v. Williams*, 10th Dist. No. 02AP-35, 2002-Ohio-4503, ¶ 58. Accordingly, we give great deference to the jury's determination of witness credibility. *Redman* at ¶ 26, citing *Jennings*. Because the trial court properly could believe the victim's testimony, the verdict is not against the manifest weight of the evidence. For the foregoing reasons, we hold that the trial court did not err when it convicted appellant of complicity to rape. Accordingly, appellant's assignment of error is overruled.

## IV. Conclusion

{¶ 28} Having overruled appellant's sole assignment of error, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

LUPER SCHUSTER and HORTON, JJ., concur.

———————————