[Cite as *State v. Kehres*, 2020-Ohio-1320.]

# IN THE COURT OF APPEALS

# ELEVENTH APPELLATE DISTRICT

# ASHTABULA COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | **O P I N I O N** |
| Plaintiff-Appellee, | : | |
| - vs - | : | **CASE NO. 2019-A-0059** |
| BEVERLY J. KEHRES, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal from the Ashtabula Municipal Court, Case No. 2018 CRB 01165.

Judgment:  Affirmed.

*Michael Franklin*, Ashtabula City Solicitor, *Lori B. Lamer,* Assistant City Solicitor, Ashtabula Municipal Court, 110 West 44th Street, Ashtabula, Ohio 44004 (For Plaintiff-Appellee).

*Jane Timonere*, Timonere Law Offices, LLC, 4 Lawyers Row, Jefferson, Ohio 44047 (For Defendant-Appellant).

THOMAS R. WRIGHT, J.

{¶1}  Appellant, Beverly J. Kehres, appeals her misdemeanor convictions for obstructing official business, falsification, and endangering children, challenging the sufficiency or the manifest weight of the evidence.  We affirm.

{¶2}  As of July 2018, appellant and her boyfriend, Scott Donathan, lived in a small home in the City of Ashtabula.  For a one-week period, Sergeant Matthew Johns of the Ashtabula County Sheriff's Department was sporadically watching the home, hoping to see Donathan driving appellant's vehicle.  Donathan was a suspect in a series of thefts

in a neighboring city, and there were three outstanding warrants for his arrest.

{¶3} At approximately 2:00 a.m. on July 27, 2018, Sergeant Johns heard over his radio that police officers from the neighboring city had been chasing Donathan in appellant's vehicle after another alleged theft, but they broke off the chase because Donathan was driving too recklessly. As a result, Johns drove to the couple's home and saw the vehicle parked in the driveway very closely to a side door. Johns decided to arrest Donathan on the outstanding warrants and asked the department to dispatch additional officers to assist.

{¶4} While multiple officers surrounded the home, Johns and a second officer, Deputy Justin Hammond, knocked on the front door and announced who they were and that they were there to arrest Donathan on the warrants. During the next nine minutes, Johns and Hammond continued to knock on the door and increased the intensity of their knocks and the volume of their voices, yet no one answered. Consequently, one of the officers kicked in the front door, but the door was difficult to open because a heavy piece of furniture was directly behind it.

{¶5} Upon entering, Johns and Hammond stepped into a small vestibule which had a second door leading into the main part of the home. The second door did not have a door knob; instead, there was a piece of rope running through the hole. This door was secured solely by a large deadbolt lock that could only be opened from the inside. Johns and Hammond began pounding on the second door and again yelled that they were there to arrest Donathan. After a few minutes, appellant came to the door. When they asked appellant to open the second door, she stuck one of her fingers through the hole where the door knob had been and made a motion as if she was trying to open the door. After

2

doing this several times for a few minutes, appellant told the officers that she could not open the door.

{¶6} Hammond used a crowbar to break down the second door. Upon entering, Johns asked appellant where Donathan was located. She said that she did not know if he was there and that she had not seen him. However, Johns noticed that there was a pair of men's shoes in the living room, so other deputies began searching the home and ultimately found Donathan hiding in a bedroom closet. Donathan told Hammond that he had heard the officers' yelling and banging and that he hid to avoid arrest.

{¶7} In searching the home, Johns entered a different bedroom and saw two young girls, ages four and one, sitting on a bed. Appellant said she was babysitting the girls for a friend. In looking for Donathan, Johns also saw that it was cluttered and very dirty. In addition to bugs in the kitchen, he saw multiple piles of dried dog feces throughout the structure. Johns also found a crack pipe on a plate in the bathroom. Thus, he called children's services to take custody of the girls.

{¶8} Appellant was charged with three offenses: obstructing official business, a second-degree misdemeanor under R.C. 2921.31(A); falsification, a first-degree misdemeanor under R.C. 2921.13(A)(3); and endangering children, a first-degree misdemeanor under R.C. 2919.22(A). Following a one-day jury trial in March 2019, appellant was found guilty on all three charges. In addition to imposing a $150 fine on each charge, the trial court sentenced her to consecutive terms of 60 days for child endangering, 30 days for obstructing official business, and 30 days for falsification, but then suspended 90 of the 120-day total. The court ordered all the jail time suspended if appellant performed 100 hours of community service.

3

{¶9} Appellant raises three assignments for review:

{¶10} "[1.] The jury verdict finding that Beverly J. Kehres committed the offense of Obstructing Official Business in violation of Ohio Revised Code §2921.31(A) is against the manifest weight of the evidence.

{¶11} "[2.] The jury verdict finding that Beverly J. Kehres committed the offense of Falsification in violation of Ohio Revised Code §2921.13(A)(3) is against the manifest weight of the evidence.

{¶12} "[3.] The jury verdict finding that Beverly J. Kehres committed the offense of Endangering Children in violation of Ohio Revised Code §2919.22(A) is against the manifest weight of the evidence or the evidence educed at trial is insufficient to support the verdict."

{¶13} Although identified as a manifest weight of the evidence challenge, appellant's first assignment asserts a sufficiency argument. She contends her conviction for obstructing official business must be overturned because the state did not present any evidence that she engaged in an affirmative act that hindered the deputies in entering the home and finding Donathan.

{¶14} "Sufficiency of the evidence is the 'legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law.' *State v. Thompkins,* 78 Ohio St.3d 380, 386 (1997), superseded by statute on other grounds. The question of whether the evidence is legally sufficient to support a verdict is a test of adequacy and a question of law. *Id.* "'The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential

4

elements of the crime proven beyond a reasonable doubt.'" *State v. Robinson,* 124 Ohio St.3d 76, 2009–Ohio–5937, ¶ 34, quoting *State v. Jenks,* 61 Ohio St.3d 259 (1991), paragraph two of the syllabus, superseded by statute on other grounds, following *Jackson v. Virginia,* 443 U.S. 307 (1979). An appellate court will not disturb a verdict unless, after viewing the evidence in a light most favorable to the prosecution, it is clear that reasonable minds could not reach the conclusion reached by the trier of fact. *State v. Treesh,* 90 Ohio St.3d 460, 484 (2001).

{¶15} "* * *

{¶16} "The test for determining whether a conviction is against the manifest weight of the evidence differs from the test as to whether there is sufficient evidence to support the conviction. 'Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other."' *Thompkins* at 387, quoting Black's Law Dictionary 1594 (6th Ed.1990) (emphasis omitted). Even though an appellate court finds sufficient evidence to support a judgment, the court may conclude that a judgment is against the manifest weight of the evidence. *Taylor* at ¶ 10, citing *Thompkins* at 387. An appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses and determine whether, in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Id.*" *State v. Anderson*, 10th Dist. Franklin No. 14AP-1047, 2015-Ohio-4458, ¶ 14-16.

{¶17} Appellant was charged with obstructing official business under R.C. 2921.31(A):

5

{¶18} "No person, without privilege to do so and with purpose to prevent, obstruct, or delay the performance by a public official of any authorized act within the public official's official capacity, shall do any act that hampers or impedes a public official in the performance of the public official's lawful duties."

{¶19} "R.C. 2921.31(A) includes five essential elements: (1) an act by the defendant, (2) done with the purpose to prevent, obstruct, or delay a public official, (3) that actually hampers or impedes a public official, (4) while the official is acting in the performance of a lawful duty, and (5) the defendant so acts without privilege." *State v. Howell*, 5th Dist. Richland No. 18CA49, 2019-Ohio-1506, ¶ 12. To satisfy the first element, the state must show that the accused engaged in an overt act; refusing to answer the door or refusing to obey an officer's request cannot form the basis of a conviction for obstructing official business. *State v. Prestel*, 2nd Dist. Montgomery No. 20822, 2005-Ohio-5236, ¶ 16. In addition, the overt act must succeed in impeding the officer's performance of his duty. *State v. Easterling*, 2nd Dist. Greene No. 2018-CA-33, 2019-Ohio-2470, ¶ 35.

{¶20} Here, the fact that appellant did not open the second door for the officers is insufficient to base an obstructing official business conviction. Yet, there is still some evidence demonstrating that appellant committed an overt act that impeded the officers from entering the home. As noted, Hammond testified that after the officers asked her to open the second door, appellant stuck one of her fingers through the doorknob hole a few times. Hammond explained that appellant "made a very low effort attempt to try to get the door open."

{¶21} During his testimony, Johns did not reference appellant's efforts to open the

6

door but testified that she engaged in stalling activities that went on for several minutes. Johns also stated that after the officers gained access to the home, he noted that the deadbolt was the only thing preventing appellant from opening the door, and it was within her reach.

{¶22} Taken as a whole, the officers' testimony supports a finding that when appellant stuck her finger through the hole and tried to pull on the door, she was engaging in a ruse designed to delay the officers' entry. Their testimony further shows that she delayed their entry by a few minutes. Thus, even though the officers ultimately entered the home, she impeded their access for a short period.

{¶23} Given the absence of any credible challenge to the truthfulness of the officers' testimony, the jury did not lose its way in finding that appellant engaged in an overt act to prevent the officers from performing their duties. Appellant's conviction for obstructing official business is supported by sufficient evidence and is not against the manifest weight of the evidence. Her first assignment is without merit.

{¶24} Appellant's second assignment challenges her falsification conviction, which was pursuant to R.C. 2921.13(A)(3):

{¶25} "(A) No person shall knowingly make a false statement, or knowingly swear or affirm the truth of a false statement previously made, when any of the following applies:

{¶26} " * * *

{¶27} "(3) The statement is made with purpose to mislead a public official in performing the public official's official function."

{¶28} As noted, after he broke down the second door, Johns asked appellant if she knew where Donathan was, and she told Johns she had not seen Donathan in the

home. In arguing that her falsification conviction is against the manifest weight of the evidence, appellant maintains that the state failed to present evidence that her statement to Johns was false. Building upon this, she further maintains that this conviction was based solely on the nature of her relationship with Donathan.

{¶29} As discussed under the first assignment, by inserting her finger in the doorknob hole and pretending to open the door, appellant engaged in behavior intended to delay the officers' entry. Given that the officers announced that they were there to arrest Donathan, one could infer that appellant's delay was an effort to protect him. Moreover, her statements that she did not know if he was home and that she had not seen him contradict the fact that a pair of men's shoes was found in the living room and that Donathan was subsequently found hiding in a closet. This coupled with the testimony that Donathan had just been involved in a police chase while driving appellant's vehicle that was currently parked in the driveway supports the jury's conclusion that appellant knowingly lied to Johns to prevent the deputies from searching her home.

{¶30} Under Ohio law, circumstantial evidence has the same probative value as direct evidence. *State v. Martin*, 11th Dist. Lake Nos. 2017-L-005 & 2017-L-006, 2019-Ohio-22, ¶ 90, quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. Appellant's conduct during the incident supports an inference that she had seen Donathan in the home and, therefore, made a false statement to the officers to protect him. Thus, her falsification conviction is not against the manifest weight of the evidence, and appellant's second assignment lacks merit.

{¶31} Under her third assignment, appellant asserts that her endangering children conviction must be reversed because the state's evidence did not support a finding that

8

the two girls were subject to a substantial risk of harm inside her home. She emphasizes that there is no dispute that she was only babysitting the children for the evening, and that they were safe when Johns found them in her bedroom. She also notes that the condition of her bedroom was relatively better than the remainder of the house and that there is no evidence the girls left that room while they were there.

{¶32} The offense of endangering children is defined in R.C. 2919.22, which states in part:

{¶33} "(A) No person, who is the parent, guardian, custodian, person having custody or control, * * * shall create a substantial risk to the health or safety of the child, by violating a duty of care, protection, or support."

{¶34} Recklessness is the culpable mental state for misdemeanor child endangering under R.C. 2919.22(A). *State v. Hill*, 11th Dist. Lake No. 2009-L-004, 2010-Ohio-709, ¶ 30. "A person acts recklessly when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that the person's conduct is likely to cause a certain result or is likely to be of a certain nature." R.C. 2901.22(C).

{¶35} The term "substantial risk" is defined as "a strong possibility, as contrasted with a remote or significant possibility, that a certain result may occur or that certain circumstances may exist." R.C. 2901.01(A)(8). Regarding a feces-contaminated home, expert testimony is not necessary for a reasonable trier of fact to find that such a place poses a substantial risk to a child's health and safety. *State v. Caton*, 137 Ohio App.3d 742, 751, 739 N.E.2d 1176 (1st Dist.2000).

9

{¶36} Johns summarized the conditions of appellant's home in his testimony, stating:

{¶37} "Overall, the house was extremely cluttered and dirty, with piles of clothing and just stuff, just garbage piling up. Specifically, there was also piles of dog feces all over the floor in different areas of the house; like actual full piles of dog feces. Um, there was bugs on the floor. They would scatter - - when you shined the light or walked through the room, the bugs would all try to go hide. There was electrical switches without any covers. The wires were just sticking out of the wall. There was - - like, the child's room had a dirty mattress with no sheets on it, and just piles of used clothes and toys all around. There was a pair of little girls' underwear on the floor intermingled with just a pile of dog feces. Um, the whole house smelled like, kind of like urine, like, cat urine or some type of ammonia or uriny smell."

{¶38} Johns further testified that the amount and condition of the feces demonstrated that this was not an instance in which one dog had an accident during the night; i.e., the feces was throughout the house and had been there for a long period. Additionally, he testified that a crack pipe was found on a counter in the home's only bathroom.

{¶39} The evidence shows that the girls were not at appellant's home for a momentary visit, but that they were there for a substantial number of hours. Hence, even if appellant's bedroom was in relatively better shape than the rest of the home, they would have still needed to use the bathroom. Moreover, Johns' testified that he saw children's toys and clothing near a pile of feces.

10

{¶40} Given the very nature of a crack pipe, dog feces, and exposed electrical wires, any reasonable juror could find that appellant acted recklessly and created a substantial risk of harm when she exposed the girls to these conditions for several hours. The jury did not lose its way in finding appellant guilty of endangering the two children, and her conviction is not against the manifest weight of the evidence. Appellant's third assignment lacks merit.

{¶41} The judgment of the Ashtabula Municipal Court is affirmed.


MATT LYNCH, J.,

MARY JANE TRAPP, J.,

concur.